## MARY OIL & GAS CO. et al. v. RAINES et al.

No. 15178—Opinion Filed March 17, 1925.

Rehearing Denied May 5, 1925.

(Syllabus)

Oil and Gas—Nuisance—Rights of Lessee in Development—Incidental Annoyances to Surface Owners no Ground for Injunction.

In an oil and gas lease the lessee is entitled to the possession of the land so leased to the extent reasonably necessary to perform the obligations imposed on him by the terms of the lease, and the annoyances caused by production of oil and gas under a lease providing for the use of the surface for that purpose, in the absence of negligence on the part of the lessee, do not constitute a nuisance, and, where the same is being operated in the ordinary way and all precautions customarily prevailing in the oil and gas industry are being used to protect the rights of the surface owners, the incidental annoyances accompanying same offer no grounds for relief by injunction.

Error from District Court, Tulsa County; Z. I. J. Holt, Judge.

Action by Beuna V. Raines et al. against the Mary Oil & Gas Company et al. Judgment for plaintiffs, and both parties bring error. Reversed and remanded.

Stuart, Cruce & Bland, E. J. Doerner, and Paul P. Pinkerton, for plaintiffs in error.

Robert F. Blair and W. H. Kornegay, for defendants in error.

PHELPS, J. On the 7th day of August, 1908, Jennie Bruner, a full-blood Creek Indian, executed an oil and gas mining lease covering her 160-acre homestead and surplus allotment in Tulsa county, Okla., to W. A. Springer and E. R. Minchell, said lease being on the regular departmental form and duly approved. Afterwards the lessees assigned this lease to the Mary Oil & Gas Company. There was a provision in the lease giving the lessees the—

"Exclusive right to prospect for, extract, pipe, store, and remove all the oil and natural gas, and to occupy and use so much only of the surface of said land as may reasonably be necessary to carry on the work of prospecting for, extracting, piping, storing, and removing such oil and natural gas; also the right to obtain from wells, or other sources on said land, by means of pipe lines, or otherwise. a sufficient supply of water to carry on said operations, and also the right to use, free of cost, oil and natural gas as fuel, so far as necessary, for the development and operation of said property."

The lease further gave the lessees and their assigns the right to drill, operate, and build or construct on the premises tools, derricks, rigs, boilers, boiler houses, pipe lines, pumping and drilling outfits, tanks, engines, and machinery, any, other, and all apparatus necessary to drill any and all wells in a workmanlike manner.

The lease contained no restrictions or limitations whatever as to the locations of the wells with reference to dwelling houses or buildings on the land, or as to any that might be located on the land. Several wells were drilled upon the premises, some of which produced gas in paying quantities continuously since about 1912 up to the filing of this action. In 1910, Jennie Bruner died, leaving surviving, her husband and two daughters, after which her 120-acre surplus allotment was sold through the county court of Tulsa county to Claud F. Tingley, who in the year of 1919 sold the same to Ross H. Rayburn, one of the original defendants in this action.

On May 22, 1919, said Ross H. Rayburn platted the 120 acres into lots and blocks under the name of Twin City Subdivision, Tulsa county, Okla., and sold the same in lots ranging in size from one-half acre to 16 acres, upon which lots some 60 or 65 buildings were erected and used, principally as homes for the owners thereof; however, the town was never incorporated. In most instances the lots were sold by Rayburn on the installment plan under contract signed by both Rayburn and the purchaser containing the following provision:

"Subject to the reservation of title in first party (Rayburn) to all oil and gas, and other minerals, contained in and under said premises, together with the right to purchase, mine, and remove the same, with full right of ingress and egress, and the use of so much of the surface of the premises as shall be necessary therefor; all of which shall be reserved to, and retained by, first party (Rayburn), his heirs, and assigns, in any deed required to be made by first party under this contract."

When the purchaser paid the installments in full, Rayburn executed a warranty deed to the property so sold containing the following provision:

"The party of the first part hereby reserves all oil, gas and mineral rights, with right to enter upon, operate and remove the same."

An abstract of title was also furnished the purchaser.

In 1923, the Mary Oil & Gas Company assigned to J. E. Fitzpatrick, the Gladys-Bell Oil Company, Black & Thompson, and others, all the oil rights below the Mississippi lime to a portion of the land in question, soon after which J. E. Fitzpatrick and the Shaffer Oil & Gas Company drilled an oil well on a portion of the lands through the Mississippi lime which had an initial production of about 1,500 barrels per day, after which the Mary Oil & Gas Company commenced the drilling of other wells on said property, the surface rights of which, however, belonged to none of the plaintiffs herein. The defendants in error then filed suit in the district court of Tulsa county against plaintiffs in error, praying for an injunction enjoining defendants from constructing, drilling, and operating any and all oil wells on any and all of said town lots located in said Twin City Subdivision, upon the grounds that the drilling and operation of said wells interfered with the peaceable occupation of the homes of plaintiffs situated upon said land and constituted a nuisance. The district court of Tulsa county enjoined plaintiffs in error from drilling upon said lands within 200 feet of any of the residences upon the premises, excepting those then being drilled, and fixed supersedeas, from which judgment both plaintiffs and defendants prosecute their appeal to this court.

For convenience the parties will be referred to herein as they appeared in the court below.

Plaintiffs claim that defendants platted the land in question and induced the plaintiffs to purchase the same, representing to them that no further development would be made upon said land, but a careful examination of the record wholly fails, in our judgment, to substantiate that claim. The evidence is undisputed that Ross H. Rayburn bought and platted the land in question individually, and that he had no connection whatever with the other defendants except that he was a brother-in-law of Charles Page, one of the defendants. The evidence further discloses the fact that none of the wells drilled, or being drilled, are located upon the lands the surface rights of which belonged to any of the plaintiffs. It further appears beyond question that the injury and damage, if any has been sustained, was caused to plaintiff's property by the well drilled by J. E. Fitzpatrick and the Shaffer Oil Company, neither of whom are parties to this action. The question, therefore, before us to decide is whether the plaintiffs, after buying the surface of the lands in question, with full knowledge and information of the existence of the oil and gas mining lease and with a specific reservation by the grantor of the mineral rights in said land, with full rights of ingress and egress and with full rights to enter upon, prospect, and develop the same, can be heard to complain if such development is commenced, made, and prosecuted in a reasonable and ordinary manner, even though to do so may cause inconvenience and annoyance to plaintiffs?

In Sanders v. Davis, 79 Okla. 253, 192 Pac. 694, this court held:

"By virtue of the terms of the usual and ordinary oil and gas mining lease, the lessee is entitled to the possession of such portions of the surface of the land covered by the lease as may be reasonably necessary for the development and exploration of the leased premises under the terms of the lease."

Also in Rennie v. Red Star Oil Company, 78 Okla. 208, 190 Pac. 391, this court held:

"In an oil and gas lease the lessee is entitled to the possession of the lands so leased to the extent reasonably necessary to perform the obligations imposed on the lessee by the terms of the lease." Citing Brennan v. Hunter, 68 Okla. 112, 172 Pac. 49; Thornton on Oil & Gas, Vol. 1, section 110; Westmoreland Gas Co. v. DeWitt (Pa.) 18 Atl. 724; Greensboro Natural Gas Co. v. Fayette (Pa.) 49 Atl. 768; Galbreath v. McLane, 51 Okla. 754, 152 Pac. 355.

We take it, therefore, that as a general proposition, where the plaintiffs bought the surface of the land in question, with full knowledge of the existence of the lease and with knowledge of the reservation of the mineral rights in the grantor, the right of defendants to go upon the land and develop it cannot be questioned, and that the prospecting for, drilling, and production of oil and gas, in the absence of negligence by lessees or their assigns, does not constitute a nuisance, and where the same is being done in the ordinary way and all precautions usually prevailing in the industry are used to prevent injury to the surface owners, the incidental annoyances accompanying such development, production, and operations will not constitute grounds for an injunction.

In Squires v. Lafferty, 121 S. E. 90, the Supreme Court of Appeals of West Virginia had under consideration an action between the owner of the mineral rights and the owner of the surface of the land, and in granting an injunction in behalf of the owner of the mineral rights, enjoining the

surface owner from interfering in the development of the property, that court used this language:

"The owner of the mineral underlying land possesses, as incident to this ownership, the right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate."

In Phillips v. Lawrence Vitrified Brick & Tile Co. (Kan.) 82 Pac. 787, the plaintiff complained that the defendant in operating its brick plant threw smoke, dust, and cinders upon her premises, killing trees and causing other injury. She asked to have the business enjoined and in denying the injunction the Supreme Court of Kansas said:

"Ordinarily an owner may make a lawful and reasonable use of his property, although it may cause some annoyance and discomfort to those in the vicinity, if such inconvenience and discomfort are only slight, and are the natural and necessary consequences of the exercise of the owner's rights in developing the resources of his property. Fogarty v. Junction City Press Brick Co. (Kan.) 31 Pac. 1052; A., T. & S. F. Ry. Co. v. Armstrong (Kan.) 80 Pac. 978."

In A., T. & S. F. Ry. Co. v. Armstrong, 80 Pac. 978, where plaintiff sought to recover damages from the railway company because of injury to his residence by being permeated with smoke, cinders and gas from the defendant's locomotives and engines, the Supreme Court of Kansas in denying relief said:

"An authorized business property conducted at an authorized place is not a nuisance for what is lawful cannot be wrongful; and the owner of a railroad thus authorized and operated is not liable in damages to one whose residence is permeated by smoke, cinders, and gas emitted from the engines to such an extent as to be injurious to the health and comfort of the inhabitants."

In Alexander v. Wilkes-Barre Anthracite Coal Co. (Pa.) 98 Atl. 794, the plaintiff brought suit to enjoin the operation of a coal mine in close proximity to her residence, alleging that its operation caused annoyance and damage to her property by escaping dust, and vibration caused by a ventilating fan operated on the premises, and the Supreme Court of Pennsylvania in denying relief used the following language:

"Defendant's business is a lawful one consisting of the development of the natural resources of the land, in which the interests of the entire community are concerned, and for which large expenditures have been made; and so long as defendant carries on its business in the ordinary way, and adopts and uses the precautions usually and customarily prevailing in the operation of such plants, it is not accountable for incidental annoyances and damages that necessarily follow its mining operations. Pennsylvania Coal Co. v. Sanderson (Pa.) 6 Atl. 453; Straus v. Barrett (Pa.) 21 Atl. 253."

In Grimes v. Goodman Drilling Co., 216 S. W. 202, the Court of Civil Appeals of Texas had before it a question similar to the one at bar, and in discussing this question that court said:

"In purchasing the lot, as we think plaintiff must be presumed to have known that the lessees had the right to sink a well on his lot, and that thereby he and his family, if occupying the premises, would be subjected to more or less inconvenience and perhaps some danger while said drilling was going on. But he bought the premises so burdened, and has no just grounds for complaint by reason of the entry upon his premises and the drilling of the well.

"But appellant further urges that he is entitled to an abatement of the nuisance created by appellees on his property, in the erection and maintenance of the derrick on his premises in a dangerous condition, so as to endanger the life and limb of the appellant and his household, and by placing the engine, boiler, and slush pit to such close proximity to appellant's house as to be a source of great danger from fire and also a great source of annoyance and inconvenience to his family and property. As appellant purchased the premises burdened with the terms of the lease, he is in no position to complain of the conditions produced by appellees, such as are usual and customary during the drilling of an oil well. If he is presumed to have known, as we think he is, that the lessees had the right to sink a well on lot 6 of the block, he is further presumed to have known that conditions would naturally arise during the drilling of said well which would make the use of the premises as a home disagreeable, inconvenient, and perhaps dangerous. Appellant must have known that in the drilling of a well a derrick was essential, and that it would be necessary to have an engine and boiler placed on the lot and a slush pit. While the slush pit is shown to be close to appellant's house, there is no evidence that appellees were negligent in placing it there, or that it could be placed elsewhere on the lot and still perform the purposes for which it is designed. The evidence shows that the boiler was placed close to a door of a storm-house on said premises that appellant used as a bedroom, and that, when complaint was made that the door to the storm-house could not be opened by reason of the proximity of the boiler, the boiler was moved so that the door

could be opened. * * * Under the circumstances, we think the trial court was justified in denying the temporary writ as prayed for, and the judgment of the trial court is hereby affirmed."

Therefore, as in the above quoted case, when plaintiffs purchased the surface rights to their lots, they are presumed to have known that the lessees had a right to drill a well on the lots, and that in so doing they and their families would be subjected to more or less inconvenience, discomfort, and annoyance, such as are incidental to and such as would naturally arise in the drilling of oil wells, but having bought the premises so burdened, they have no just grounds for complaint by reason of the drilling of the wells by the Mary Oil & Gas Company, provided the drilling of the same is done in the usual and ordinary manner and the usual and ordinary precautions taken to prevent injury and annoyance, which, according to the record, was done in this case.

The judgment of the district court is therefore reversed, and the case remanded, with instructions to dismiss.

NICHOLSON, C. J., and MASON, HARRISON, LESTER, CLARK, and RILEY, JJ., concur.